# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 08-163(1) (DWF/AJB) |
| Plaintiff, | |
| v. | **ORDER** |
| Paul Edward Anderson, | |
| Defendant. | |

Benjamin Bejar, Assistant United States Attorney, United States Attorney's Office, counsel for Plaintiff.

Jean M. Brandl, Esq., Brandl Law, LLC, counsel for Defendant.

This matter is before the Court on the government's allegations that Defendant Paul Edward Anderson violated the conditions of his supervised release by using cocaine. The government contends that the defendant used cocaine in violation of his conditions of supervised release based upon a positive sweat-patch test for cocaine metabolite. The test was collected on April 17, 2017, and received by PharmChem on April 27, 2017. The defendant denies that he used cocaine and asserts that the sweat-patch test is not sufficiently reliable to show by a preponderance of the evidence that he used cocaine.

By way of background, on September 25, 2008, the defendant entered a plea of guilty to Possession with Intent to Distribute 176.3 grams or more of Cocaine Base. On March 19, 2009, the Honorable James M. Rosenbaum sentenced the defendant to the

custody of the Bureau of Prisons for 66 months, followed by 5 years of supervised release. On January 14, 2014, the defendant was released from the custody of the Bureau of Prisons and placed on supervised release.

Anderson first violated the conditions of his release by using cocaine in 2016, when he tested positive for cocaine pursuant to a urinalysis on October 31, 2016. At the time, he admitted to using cocaine. Since that admitted use, the defendant has been tested for the use of cocaine and other controlled substances using sweat patches. Additionally, as a result of the positive test in October 2016, the Court directed that each week the defendant participate in not-less-than-one AA or NA meeting or 12-step program. This condition was to begin after the defendant completed a relapse-treatment program at New Directions. The Court also directed that the defendant make a good-faith effort to obtain and work with an AA or NA sponsor. These additions to the defendant's conditions of supervised release were made by the Court pursuant to a November 4, 2016 modification, to which the defendant agreed.

On December 8, 2016, the defendant appeared before this Court for a Zero Tolerance[1] hearing after again testing positive for cocaine and admitted on the record that his sweat patch tested positive on November 22, 2016, because he had used cocaine. He

---

[1] It is this Court's policy to require a defendant to appear before the Court when they test positive for the use of alcohol or drugs if such a use violates a condition of supervised release or probation. The Court uses the hearing to evaluate next steps in terms of a violation, participation in in-patient or out-patient treatment, including 12-step work and oftentimes requiring a defendant to serve a weekend in jail.

also admitted at the hearing that the sweat patch being tested at the time of the hearing, as well as the sweat patch he was wearing at the hearing, would test positive because he had used cocaine. But the defendant later told his probation officer, Steven H. Blanding, that he had not used cocaine and only admitted to doing so based on the advice and encouragement of his counsel at the time. At the next Zero Tolerance hearing on March 17, 2017, the defendant again did not dispute the results of a positive sweat-patch test for cocaine metabolite from the sweat patch which was removed on February 22, 2017. The defendant maintained that he did not use cocaine, but could not explain why his sweat patch was positive for cocaine.

In *United States v. Meyer*, 483 F.3d 865 (8th Cir. 2007), the Eighth Circuit explained how the sweat-patch test worked:

> [The sweat-patch test,] marketed by PharmChem, Inc., is composed of an absorbent pad and outer membrane. After the skin is cleaned with alcohol, the patch is applied to the wearer[], and the absorbent pad collects the wearer's sweat, over a period of a week or more. The [wearer]'s sweat wets the pad, the water in the sweat eventually evaporates through the non-occlusive membrane, and any drugs remain in the absorbent pad. Once the sweat patch is removed from the [wearer], it is returned to PharmChem for analysis.

*Meyer*, 483 F.3d 865 at 866 (citations omitted). Anderson has been tested 32 times with a sweat patch from November 2016 and going through July 18, 2017. Of those 32 tests, Anderson tested positive 5 times, including his most recent positive test on April 17, 2017. The defendant tested negative before and after April 17, 2017. Since the end of July 2017, Anderson has been tested via urinalysis, which have also returned negative

3

results.  At the August 30, 2017 evidentiary hearing, the issue before the Court was whether the defendant used cocaine as indicated by the sweat patch collected on April 17, 2017.  (Gov.'s Ex. 1.)

In a revocation proceeding, a violation "need only be found by a judge under a preponderance of the evidence standard, not . . . beyond a reasonable doubt."  *United States v. Woodward*, 675 F.3d 1147, 1152 (8th Cir. 2012) (quoting *Johnson v. United States*, 529 U.S. 694, 700 (2000)).  At the evidentiary hearing, the Court received evidence from both parties, including the defendant's probation officer; the defendant; an expert who tested the defendant's hair sample; and a forensic scientist who discussed sweat-patch testing, nail testing, and hair testing.

The defendant previously tested positive for cocaine metabolite and admitted to using cocaine at the end of October 2016, consistent with the positive sweat patches collected on November 22, 2016, and November 29, 2016.  Nonetheless, the defendant now disputes the accuracy of those positive results, stating that he had not used cocaine.  The defendant hypothesizes that he tested positive due to some unknown exposure from his job as a mechanic, where he predominately works on taxicabs.  As a preventive measure, the defendant started wearing gloves at work after his positive test in April 2017.  Probation Officer Blanding corroborates Defendant's belief, testifying that on December 5, 2016, the defendant had told Blanding that perhaps the earlier positive sweat-patch results were due to having sexual intercourse with a woman who was either using or had recently used cocaine.  The next day, December 6, the defendant told

4

Probation Officer Blanding that the positive test could have been because he had recently been given novocaine for a root canal.

In *United States v. Meyer*, the defendant contended that his employment and work conditions (similar to those here) were the cause of the positive sweat-patch tests for cocaine metabolite:

> I can come up with one possibility, that up until that point I was employed by a company who hauled high-end cars, Corvettes, Mercedeses, Jaquars, Cadillacs, all high[-]end stuff, stuff that was going to clients who were rich people. I changed [to] hauling cars that were repossessed, bought from auctions, they weren't clean, they weren't detailed. There would have been any chance and every chance for me to come into contact with contamination from somebody who had done drugs in their cars, touched a steering wheel, touched the gearshift, touched the door handle. Somebody could have been smoking in there. It could have been in the headliner. I came in contact with things like that.

*Meyer*, 483 F.3d 865 at 867. The Eighth Circuit rejected the argument, concluding that "sweat patch results are a generally reliable method of determining whether an offender has violated a condition of his or her [supervised release]." *Id.* at 869.

Here, the government asserted that the sweat-patch tests are reliable and that the test in question before this Court was reliable. The government offered testimony of the probation officer, documentary evidence from PharmChem and its business records establishing the chain of custody, and the absence of any external contamination. The government also submitted the transcript of testimony by Dr. Leo Kadehjian from another revocation hearing. Kadehjian is an expert witness who explained in detail why the sweat-patch test is reliable. (Gov.'s Ex. 5.) Both parties submitted documentary

5

evidence and articles addressing both the reliability of the PharmCheck sweat-patch results as well as the issue of environmental contamination. The documentary evidence also included articles and literature addressing hair- and fingernail-drug testing. (Gov.'s Exs. 10, 11, 12, 13, 14, 15, 22, 23.)

In *Meyer*, the Eighth Circuit held that a defendant may rebut the presumption of the accuracy of sweat-patch tests by showing that there are "compelling reasons to believe that positive test results from sweat patches [were] erroneous" in a particular instance. *Myer*, 483 F.3d at 869. Based upon the record before this Court, Anderson has not offered a compelling reason for this Court to question the April 2017 sweat-patch results. The Court respectfully rejects the defendant's assertion that environmental contamination at his workplace environment caused the positive test result. While the defendant might believe that he did not use cocaine, the evidence before this Court establishes by a preponderance of the evidence that the sweat-patch results were reliable and accurate, particularly because Defendant once again tested positive for cocaine metabolite. Consequently, the Court specifically rejects Defendant's assertion that he ingested cocaine as a result of servicing a taxi or another motor vehicle during his workday.

The Court conclusion is buttressed by the history Defendant's sweat-patch test results. Even though the defendant now denies that he used cocaine after his positive result in October 2016 and, in so doing, attacks the reliability of the sweat patch test, he nonetheless has no plausible explanation for why the sweat patch results worked fine

when they produced negative results. While the defendant has started wearing gloves since his positive test in April, he has failed to explain why workplace contaminants did not consistently produce positive test results. Moreover, the defendant would have had to ingest and metabolize the cocaine for the metabolite to be produced, and it would not be present if the sweat patches had somehow been contaminated by cocaine in the environment. *Meyer*, 483 F.3d 865 at 869 ("In order to test positive not only for cocaine but also for cocaine metabolite, Meyer would have needed to *ingest* cocaine residue inadvertently from the vehicles that he hauled." (emphasis in original)).

Additionally, the Court's conclusion is not impacted by the direct testimony and documentary evidence regarding hair and fingernail tests. During the evidentiary hearing, the experts for the defendant conceded that low levels of drugs can go undetected by hair and fingernail tests. The Eighth Circuit in *Meyer* went so far as to call hair-test results as "legally meaningless" and are not "generally viewed as reliable indicators of drug use." *Id.* at 870. Likewise Courts in this District have recognized the unreliability of hair and fingernail tests. *See United States v. Welch*, Crim. No. 14-196, Doc. No. 50.

## CONCLUSION

After a close and careful scrutiny of the entire record, including the testimony of the experts and the defendant, and the history of the case, including all sweat-patch test results, the Court concludes that the government has established by a preponderance of the evidence that the defendant violated the terms of his supervised release by using cocaine. The Court hopes that all of the parties in this case, including this Court, can

7

focus on the defendant's rehabilitation and that he can do the same because he has a lot of good things going on in his life at this time, including the custody of his four-year-old son. The Court expects the defendant to sit down with his probation officer and have a discussion about where we go from here, prior to the Court's hearing on this violation. The Court has not issued a warrant and will not do so, assuming full compliance with all conditions of supervised release. Those same conditions, from the Court's point of view, not only serve the best interests of the defendant and the community that he lives in, but also the best interests of his son and his family and friends. At the next hearing in this matter, we will discuss what options are available so that we can acknowledge the progress that the defendant has made, while imposing a fair and reasonable disposition that is consistent with the law and addresses all issues before the Court. The Court welcomes this discussion.

Based upon the presentations of the parties and all of the files, records, and proceedings herein, and the Court being otherwise duly advised in the premises, the Court hereby enters the following:

**ORDER**

Based upon the Court's finding that Defendant Paul Edward Anderson has violated his conditions of supervised release by using cocaine, the Court will set a disposition hearing for November 17, 2017, at 10:00 a.m., in Courtroom 7C, 7th Floor, Warren E. Burger Federal Building and United States Courthouse, 316 North Robert Street, St. Paul, Minnesota. This order contemplates that the probation officer will meet with the

8

defendant so that all parties can be aware of what options are available prior to the hearing before this Court.

Dated:  October 11, 2017         s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 United States District Judge